Filed 5/8/15  P. v. Williams CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B252994 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA124662) |
| v. | |
| MELVIN WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County. Laura R. Walton, Judge.  Affirmed.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * * * * * *

In a consolidated information, defendant and appellant Melvin Williams was charged with multiple felony counts related to an assault on his girlfriend, Carliss Bell, in August 2012, and the attempted murder of Ms. Bell and her brother in October 2012. Defendant was convicted by jury on 10 counts, including corporal injury on a cohabitant, making criminal threats, assault by means of force likely to produce great bodily injury, and two counts of attempted premeditated murder. Defendant was sentenced to 48 years to life, plus an eight-year determinate term.

Defendant contends the counts for attempted murder and assault by means of force likely to produce great bodily injury fail for lack of substantial evidence. Defendant further argues the trial court committed error by failing to instruct on the lesser included offense of simple assault and by giving the flight instruction. Finally, defendant argues the court abused its discretion in denying his motion to dismiss his prior strike pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Carliss Bell began dating defendant sometime in the fall of 2011. By August 2012, defendant was living with Ms. Bell at her home in south Los Angeles, along with Ms. Bell's youngest daughter, and Ms. Bell's older brother, Darrell Williams.[1]

### 1. The August 2012 Incident

On the evening of August 25, 2012, defendant and Ms. Bell went to a party for one of her coworkers. At some point during the party, defendant got angry at Ms. Bell and they argued, partly because she was receiving compliments from other male guests. Both of them raised their voices. Defendant walked to the car to leave and Ms. Bell followed him. They drove home, continuing to argue.

After they arrived home, defendant snatched Ms. Bell's purse from her and threw it. Defendant then became physical with Ms. Bell, pushing and pulling at her. In

---

[1] Darrell and defendant share a common surname, but are not related. For the sake of clarity, we will refer to Darrell by his first name.

2

response, Ms. Bell shoved defendant several times. Defendant then threw Ms. Bell on the floor and dragged her across the room by her hair. They continued to yell at each other. Defendant also choked Ms. Bell, punched her on the top of the head, bit her face, shoved her into the kitchen counter, threatened her with a kitchen knife, threw toilet water on her, urinated into a cup and threw his urine on her.

Ms. Bell locked herself in the bathroom. After washing off the urine and toilet water defendant had thrown on her, Ms. Bell spent the night sleeping on the bathroom floor because she was afraid of what else defendant might do.

In the morning, Ms. Bell's eldest daughter, who had come over that morning, called the police to report the assault. Catarino Perez, an officer with the Los Angeles Police Department, went with his partner to Ms. Bell's home. Ms. Bell explained what had happened the night before, including being punched in the head by defendant, sleeping in the bathroom all night "to prevent further assault" and having suffered previous assaults by defendant. Officer Perez observed some bruising on Ms. Bell. Photographs were taken documenting the injuries Ms. Bell received in the altercation, including numerous bruises and the bite mark on her face. With the officers' assistance, Ms. Bell completed and signed a request for a domestic violence protective order.[2]

In her supporting declaration for the request for a protective order, Ms. Bell described the August 25 incident, as well as two previous incidents, one in April 2012 and another in June 2012. The April incident occurred at a jazz concert where defendant saw Ms. Bell hug an old classmate that she ran into at the event. Defendant confronted Ms. Bell about it, knocked her to the ground, causing bruising, and drove off in her car, leaving her stranded. Ms. Bell did not report the incident to police at the time.

The June incident occurred at Ms. Bell's home. Defendant became irate and threw food he had just brought home for Ms. Bell on the floor. Defendant then proceeded to

---

[2]    On cross-examination, Ms. Bell stated there was some truth to the facts in her request for a protective order, but that she also embellished some facts because she was angry.

3

throw Ms. Bell to the ground, "snatched" her clothes off, and dragged her to the bedroom. He kept her in the bedroom by pointing a shotgun at her, while he waited for an iron he had turned on to heat up. Defendant put the hot iron near her face and used the steam to burn her. Defendant also touched the tip of the hot iron to her chin. Ms. Bell suffered bruises, burns and welts. As with the April incident, Ms. Bell did not report the incident to police.

Officer Perez arrested defendant for the August 25 incident and took him into custody. Ms. Bell repeatedly told the officers she "did not want to press charges." Defendant was charged with inflicting corporal injury on a cohabitant, assault and making criminal threats in case No. TA125534. The domestic violence protective order was filed and served on defendant. Defendant was released on bond on or about October 21, 2012.

**2.      The October 2012 Incident**

After defendant's release, Ms. Bell agreed to meet him at a phone store, even though she knew the domestic violence protective order was in effect. She bought a new cell phone for defendant so they could talk. The next day, defendant called Ms. Bell. He asked if she would come over to the home of a friend where he was staying. Ms. Bell said no, and instead suggested getting together at a restaurant to talk. They agreed to meet at a restaurant in Lawndale for dinner.

During dinner, defendant again asked Ms. Bell to go home with him and she said no. When they were leaving, he repeated the question and she again refused. While Ms. Bell was driving home, defendant called and asked her again to please come over to stay with him. Ms. Bell refused, but they continued to talk on the phone while driving. After Ms. Bell arrived home, defendant called her numerous times asking for her to come over and she repeatedly hung up on him.

Just before Ms. Bell was going to hang up the phone on the last call, defendant told her "I wouldn't do that again if I were you," or words to that effect. After she hung up, defendant appeared in the hallway outside her bedroom. Defendant had changed clothes since leaving the restaurant. He was wearing all black, including black gloves

4

and a black knit cap or "beanie." He was also holding a shotgun and had a bandolier, loaded with shotgun shells, strapped across his chest.

Ms. Bell was surprised to see defendant in her home. She did not believe he had the keys to her house anymore. She asked him what he was doing there and defendant said something like "you're doing to die."

Darrell was awakened by the sound of his sister's voice. It sounded like she was arguing with someone, and he thought she may have been on the phone. As he walked down the hall, he could see his sister sitting on her bed and someone was standing at the foot of the bed, dressed all in black holding a shotgun. When the individual turned towards him, Darrel saw that it was defendant.

Defendant immediately pointed the shotgun at Darrell and told him to get back to his room. Darrell backed down the hall towards his room, with defendant coming at him the entire way, pointing the shotgun at him. When they reached Darrell's room, defendant ordered Darrell to lie face down on the floor.

Ms. Bell followed defendant down the hall. Defendant handed Ms. Bell duct tape and told her to tape Darrell's legs together at the ankles. Defendant also told Darrell to put his hands behind his back. Ms. Bell started to fumble with the tape. She kept asking defendant why he was doing this. Defendant repeatedly said "the two of you are going to die tonight," or words to that effect. Ms. Bell wrapped the tape once or twice around Darrell's ankles and then pretended she could not pull anymore tape off of the roll.

When defendant reached down to grab the tape, Ms. Bell grabbed defendant and they both fell down onto Darrell. Ms. Bell attempted to wrest the gun from defendant. While Ms. Bell and defendant "tussled," Darrell jumped up and grabbed defendant from behind. Darrell tried to pin defendant's arms to his sides so that the shotgun would be pointed toward the ground. During the struggle, the shotgun was fired once. The bullet went through the floor and into the kitchen downstairs.

At that point, Darrell was able to knock defendant to the floor and pin him there. Ms. Bell grabbed the shotgun, ran down the hall to her room, and threw the shotgun out her bedroom window. Darrell yelled for his sister to call the police while he continued to

5

hold defendant on the floor. After Ms. Bell locked herself inside the bathroom, she called 911.

Ms. Bell told the 911 operator that defendant, whom she described as her ex-boyfriend, was trying to kill her. She said she was hiding in the bathroom and had taken defendant's gun, but she was afraid he could hurt her brother. She explained a mirror had been broken during the struggle, and she feared defendant could stab her brother with a broken piece of glass.[3]

After several minutes of pinning defendant to the floor while he continued to struggle, Darrell was getting tired and hoped the police had arrived. Darrell escorted defendant downstairs, holding onto him from behind the entire way. Defendant complained to Darrell to release him, and kept saying "I need to get out of here."

Officer Perez and his partner, Officer Noel Sanchez, reported to Ms. Bell's home in response to the 911 call. Upon arriving, Officer Perez saw defendant's red Volvo in front of the residence, which he recognized from his previous visit to the home in August.

The officers approached the front door and Officer Sanchez knocked. The door was opened almost immediately by defendant, who saw the officers and quickly slammed the door shut. Defendant pulled away from Darrell and ran toward the kitchen and the back of the house. Outside, Officer Perez called for backup units.

Darrell opened the door again and let the officers inside, telling them defendant had run toward the kitchen. The house was dark. Both officers repeatedly called out to defendant and he eventually came out into the living room and was detained without further incident. Defendant was placed under arrest. He had an empty knife sheath attached to his belt, and a hunting knife was later discovered lying on the kitchen counter.

Officer Perez located Ms. Bell, who was "crying" and "yelling hysterically for her brother." Officer Perez noted areas of "redness" on Ms. Bell consistent with a struggle. Ms. Bell recounted the events of that evening to Officer Perez, explaining how defendant

---

[3]     The recorded 911 call was played for the jury.

had surprised her by appearing in her bedroom, and that he had pointed the shotgun at her and told her "you're going to die, bitch." Ms. Bell said she heard Darrell calling for her from down the hall, and defendant turned on him and pointed the shotgun at him. She explained the struggle and that after getting the shotgun away from defendant, she had thrown it out her bedroom window.

Officer Perez testified he located the shotgun beneath Ms. Bell's window consistent with her story. In searching the home for evidence, a bullet hole was discovered in the floor of Darrell's bedroom that went through into the kitchen below. When Officer Sanchez searched defendant's Volvo, he discovered a full can of gasoline on the floorboard area of the front passenger seat. Darrell's injuries from the altercation were documented, including some minor cuts and bruises on his body, and cuts on his feet from the mirror broken during the struggle.

### 3. The Charges

The court granted the prosecution's motion to consolidate the charges arising from the August 2012 incident (initially filed in case No. TA125534) with the new charges from the October 2012 incident under case No. TA124662. By amended information, defendant was charged with the following 10 counts: corporal injury to a cohabitant (Pen. Code, § 273.5, subd. (a)[4]; count 1); assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 2); criminal threats (§ 422, subd. (a); count 3); two counts of attempted premeditated murder (§§ 664, 187, subd. (a); counts 4 & 5); possession of a firearm by a felon (§ 29800, subd. (a)(1); count 6); contempt of court (§ 166, subd. (c)(1); count 7); first degree burglary (§ 459; count 8); and two counts of assault with a firearm (§ 245, subd. (a)(2); counts 9 & 10).

It was specially alleged as to counts 4 and 5 that defendant personally used and personally discharged a firearm in the commission of the attempted murders of Ms. Bell and Darrell within the meaning of section 12022.53, subdivisions (b) and (c). It was also

---

[4] All further undesignated section references are to the Penal Code.

specially alleged as to counts 8, 9 and 10 that defendant personally used a firearm in the commission of the offenses within the meaning of section 12022.5, subdivision (b). It was further alleged as to all counts, except count 7, that defendant had suffered a prior conviction for a serious felony within the meaning of the "Three Strikes" law. (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)

Defendant pled not guilty and denied the special allegations.

**4.     The Jury Trial**

The prosecution presented its case-in-chief as described in parts 1 and 2 above. Ms. Bell testified under subpoena, explaining she did not want to testify and had filled out the domestic violence protective order in August 2012 only because she was angry at defendant for his conduct on August 25. She said she still considered herself to be in a relationship with defendant and did not want him prosecuted.

Defendant testified on his own behalf. Defendant admitted he suffered a felony assault conviction in 1988, a felon in possession of a firearm conviction in 1991 and a misdemeanor battery conviction in 1998. Defendant said he had held regular jobs as a school teacher, as a service manager at a car dealership, and most recently running a home business providing care for the developmentally disabled.

Defendant said he began dating Ms. Bell in 2011, about the same time he was finalizing his divorce from his wife of approximately 16 years. About four months or so into his relationship with Ms. Bell, they were in an auto accident. Ms. Bell was driving under the influence and she lost control of the car. The car flipped over and defendant was ejected. He sustained serious injuries, including fractures to his skull and a subdural hematoma. He began living with Ms. Bell upon release from the hospital and suffered regular headaches after the accident. Defendant felt his personality after the accident was a little different, like he had less patience. Ms. Bell started to verbally belittle defendant and they started to "bicker" a lot between April and October 2012. Ms. Bell could be very argumentative and used her "mouth like a sword." Defendant conceded the arguments sometimes "[got] out of hand" and he did sometimes get physical with Ms. Bell.

8

Defendant admitted that he and Ms. Bell had an altercation at a jazz concert which may have been in April 2012. He said they argued about her hugging another man and he pushed her to the ground. Defendant explained that the incident with the iron was minor and occurred when they were sitting on the floor together ironing decals onto some T-shirts. Ms. Bell was saying something "smart" to him and defendant just held up the iron casually and pressed the steam button and told her to shut up. Defendant denied holding the iron up to Ms. Bell's face.

Defendant testified the facts of the August 2012 incident had been "exaggerated." Defendant recalled the argument started over a dress; Ms. Bell was mad at him for putting it in the dryer. He said it was embarrassing for her to be yelling about something so childish at a party with a bunch of her coworkers so he wanted to leave. Defendant admitted he and Ms. Bell argued, they pushed one another, he threatened her with a knife, he threw his urine and toilet water on her, and he "put [his] hands" on her. He also admitted that he choked Ms. Bell and gave her a "monkey bite" on her face. After his arrest for that incident, Ms. Bell continued to communicate with him in jail, and she even met with him on the day he was released on bond. Ms. Bell offered to buy him a new cell phone so they could keep in touch. The next day or so, they met up again for dinner in Lawndale.

Before meeting Ms. Bell for dinner, defendant had a couple of drinks with some friends in the afternoon. During dinner, he and Ms. Bell talked about their relationship. When they were through, defendant asked Ms. Bell to come home with him and she said no. Defendant explained he believed Ms. Bell was annoyed at him because he was staying at the home of a female friend. He continued to invite her to come over, explaining that he was not with the other woman or anyone else. Defendant said he continued to try to explain the situation to her over the phone while they were in their respective cars driving home after dinner, but Ms. Bell continued to refuse to come over.

Ms. Bell started hanging up on him, which he found demeaning, so he kept calling her back, but she kept hanging up. Defendant therefore decided to drive to Ms. Bell's house. He only wanted to clear up the misunderstanding. Defendant denied having any

9

intention to kill Ms. Bell. Defendant knew Darrell lived at Ms. Bell's home and he denied having any intent to kill Darrell either.

Defendant was angry and frustrated with Ms. Bell and decided he would scare her to get her attention. He admitted he went to her home, surreptitiously entered and changed into the all-black outfit she described. Defendant did not put on any shoes because he did not want to be heard going up the stairs. He said he wanted to "scare the mess out of her." He thought the bandolier would look "pretty scary." Defendant knew the shotgun was kept at Ms. Bell's house, so he grabbed that as well, went up the stairs and confronted her in her bedroom. He denied ever saying anything like "you're going to die, bitch." Defendant explained he only asked Ms. Bell why she always thought the worst of him, and that they proceeded to talk for around 20 minutes or so. Defendant knew the gun was loaded, and he never pointed the gun at Ms. Bell or Darrell.

Defendant conceded he went to Darrell's room and ordered him to lie on the ground. Darrell was bigger than defendant and he felt he was always getting into their "business." Ms. Bell followed him to Darrell's room and defendant told her "[w]hy don't you tape that n---- up." He said there was duct tape on the dresser and he told Ms. Bell to tape up Darrell. She tried to pull the tape from the roll, but appeared to be having trouble. When he leaned over to help her, Ms. Bell grabbed him and the gun discharged. Defendant denied intentionally firing the gun and said it was fired accidentally. He had been pointing it at the ground and not at either Darrell or Ms. Bell.

After Ms. Bell ran out of the room with the gun, Darrell and defendant continued to "scuffle" in the bedroom. He said they even laughed at one point and discussed how crazy Ms. Bell could get. Defendant denied slamming the door on the police, saying he opened and closed the door "gently." Darrell told him he should run out the back door but he said he would not do that. When the police arrested him, he no longer had the bandolier on because it "just fell off" when he went into the kitchen.

Defendant reiterated he had no intent to harm either of them. He only wanted to scare them. Defendant explained he had the can of gasoline in the car because he was having trouble with the engine cutting out, and the gas gauge and other parts of the

10

instrument panel were not reliable. He was never sure if the engine problems were because of a lack of gas, so he kept the can of gas just in case.

The manager of a Volvo dealership testified that defendant brought his Volvo in to be looked at in July 2012, complaining the engine would "cut out." He explained the problem could not be duplicated by a technician, but defendant was told that a new driver information module was the recommended repair. Defendant did not have the repair made.

Dr. Ronald Markman, a forensic psychiatrist, testified for the defense. He stated his opinion that based on the head trauma defendant received in the car accident with Ms. Bell, defendant suffered from "adjustment disorder with mixed disturbance of emotions and conduct." Stated another way, Dr. Markman explained defendant had a personality disorder with "impulsive and aggressive features." The condition could lead to "an overreactive response."

### 5. The Verdict and Sentencing

The jury found defendant guilty on all 10 counts, and found the special allegations true, except that the jury was unable to reach a verdict on the allegation that defendant personally discharged a firearm in the commission of counts 4 and 5 (attempted murder). The prosecutor declined to retry defendant on that allegation. Defendant waived jury on the prior strike allegation. The court found defendant's felony conviction for assault in 1988 qualified as a strike for sentencing purposes, and denied the defense motion to strike the prior pursuant to *Romero*.

The court sentenced defendant to an aggregate sentence of 48 years to life, plus an eight-year determinate term. The court awarded total presentence custody credits of 519 days and imposed various fines and fees. This appeal followed.

### DISCUSSION

### 1. Substantial Evidence Supports the Attempted Murder Counts

Defendant contends the record lacks substantial evidence he harbored a specific intent to kill Ms. Bell and Darrell, and also lacks substantial evidence demonstrating he took a direct, but ineffectual, step toward committing the offenses of attempted murder.

11

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 (*Rodriguez*).) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*Ibid*.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; accord, *People v. Manriquez* (2005) 37 Cal.4th 547, 577.)

"[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.' " (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

Defendant told both victims he intended to kill them more than once. (*People v. Morales* (1992) 5 Cal.App.4th 917, 925-926 (*Morales*) [a "defendant's statement of intention to kill a person" may be "sufficient to prove intent to kill"].) Defendant's conduct on that October night also raised a reasonable inference he intended to kill Ms. Bell and Darrell. Defendant drove to their home near midnight, surreptitiously entered the residence, changed into all black clothing, including a black cap and gloves, but specifically left his shoes off so that he would not be heard coming up the stairs to the bedrooms, strapped a bandolier of shotgun shells to his chest, strapped a knife to his belt, and carried a loaded shotgun up the stairs to frighten Ms. Bell. When Darrell appeared in the hallway, defendant pointed the shotgun at him and ordered him back to his room and commanded him, at gunpoint, to lie on the floor. Defendant then ordered Ms. Bell to tape up her brother with duct tape he handed her.

The evidence of defendant executing his planned attack until the victims were able to disarm him was solid evidence of his intent to kill. (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946 [rejecting the defendant's "untenable theory that an unsuccessful" attempt at murder "constitutes conclusive evidence of lack of intent"]; see also *People v. Avila* (2009) 46 Cal.4th 680, 702 [the degree of resulting injury to the victim "is not dispositive" of the defendant's intent; "a defendant may properly be convicted of attempted murder when no injury results"].)

We are not persuaded by defendant's contention that he could not have had the intent to kill because he did not immediately kill both victims. Simply because defendant did not fire his weapon the moment he saw both victims does not mean it was unreasonable for the jury to find defendant intended to kill them that evening. And, defendant's self-serving testimony that he intended to only scare Ms. Bell and Darrell also does not undermine the jury's verdict. The jury is the sole judge of credibility and they were not required to believe defendant's testimony that he harbored no intent to kill, particularly in the face of the contrary testimony that he expressly declared he intended to kill them and acted like he intended to kill them.

Moreover, the same evidence constitutes substantial evidence defendant took a direct, but ineffectual step, toward commission of the offenses. (See, e.g., *Morales*, *supra*, 5 Cal.App.4th at pp. 926-927 [where defendant's scheme is shown, even "slight acts done in furtherance of the crime will constitute an attempt"; there need not be evidence of conduct constituting the "last possible step prior to the commission of the crime"].)

The evidence below showed far more than "slight acts." Defendant drove to the victims' home late at night, took time to dress up and arm himself in a manner he conceded made him look "scary," confronted both victims at gunpoint, declared they were going to die that night, and was in the process of forcing Ms. Bell to tape up her brother to immobilize him when the victims were able to disarm him and thwart completion of the crimes. There was substantial evidence defendant took direct but ineffectual steps to kill both victims.

13

## 2.  Substantial Evidence Supports the Assault Count

Defendant also raises an insufficient evidence argument as to count 2, the assault on Ms. Bell by means of force likely to cause great bodily injury arising from the August 2012 incident.  Viewing the record, as we must, in the light most favorable to the verdict, there is substantial evidence that defendant's assault on Ms. Bell was committed by means of force likely to cause great bodily injury.  (*Rodriguez*, *supra*, 20 Cal.4th at p. 11.)

Subdivision (a)(4) of Penal Code section 245 " 'prohibits an assault by means of force *likely* to produce great bodily injury, not the use of force which does in fact produce such injury.  While . . . the results of an assault are often highly probative of the amount of force used,' " they are not conclusive.  (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748.)  " ' "The crime . . . , like other assaults, may be committed without infliction of any physical injury, and even though no blow is actually struck.  [Citation.]  The issue, therefore, is not whether serious injury was caused, *but whether the force used was such as would be likely to cause it*." ' [Citation.]" (*Ibid*., italics added.)  Use of hands or fists and no weapon can support a charge of assault by means of force likely to cause great bodily injury.  (*Ibid*.)  "Whether a fist used in striking a person would be likely to cause great bodily injury is to be determined by the force of the impact, the manner in which it was used and the circumstances under which the force was applied." (*Id*. at pp. 748-749.)

In the August 2012 incident, defendant pushed and shoved Ms. Bell, knocked her to the ground, dragged her across the floor by her hair, punched her on top of the head, shoved her into the kitchen counter, threatened her with a knife, choked her and bit her face.  Defendant admitted in his own testimony that he shoved, choked, and threatened her with a knife.  The assault resulted in visible bruising to her neck and a visible injury on her cheek.  This evidence is sufficient to support the jury's determination that defendant used force likely to produce great bodily injury.  (*People v. McDaniel*, *supra*, 159 Cal.App.4th at pp. 748-749.)

14

**3.**    **The Court Did Not Err in Failing to Instruct on Simple Assault as a Lesser Included Offense**

Defendant contends the court erred by failing to instruct sua sponte on simple assault as a lesser included offense to count 2.  We review a claim of instructional error de novo.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 217.)

The court's obligation to instruct on all principles of law relevant to the issues raised by the evidence at trial includes the obligation to instruct " 'on any lesser offense "necessarily included" in the charged offense, *if there is substantial evidence that only the lesser crime was committed*.  This venerable instructional rule ensures that the jury may consider all supportable crimes necessarily included within the charge itself, thus encouraging the most accurate verdict permitted by the pleadings and the evidence.' [Citation.]" (*People v. Smith* (2013) 57 Cal.4th 232, 239, italics added; accord, *People v. Bradford* (1997) 15 Cal.4th 1229, 1344-1345.)

However, no duty to instruct arises unless there is substantial evidence to support a jury finding on the lesser offense.  "An instruction on a lesser included offense *must be given only when the evidence warrants such an instruction*.  [Citation.]  To warrant such an instruction, there must be substantial evidence of the lesser included offense, that is, 'evidence from which a rational trier of fact could find beyond a reasonable doubt' that the defendant committed the lesser offense.  [Citation.]  Speculation is insufficient to require the giving of an instruction on a lesser included offense.  [Citations.]  In addition, a lesser included instruction need not be given when there is no evidence that the offense is less than that charged." (*People v. Mendoza* (2000) 24 Cal.4th 130, 174, italics added.)

Simple assault is a necessarily included lesser offense to an assault by means of force likely to produce great bodily injury.  (*People v. Rupert* (1971) 20 Cal.App.3d 961, 968.)  But, the court had no duty to give the lesser included instruction because there was no substantial evidence that the August 2012 assault on Ms. Bell was only a simple assault.  Rather, the evidence showed a prolonged physical attack on Ms. Bell of a kind likely to produce great bodily injury.  No reasonably jury could have found on this record that defendant committed only simple assault.

**4.     The Court Did Not Err in Giving a Flight Instruction**

Defendant's second claim of instructional error is that the court prejudiced the jury by giving a flight instruction because there was no evidence of flight to warrant the instruction.  Defendant argues he never fled the scene in either August or October 2012 and was arrested without incident both times at the scene.

The jury was instructed with CALCRIM No. 372 as follows:  "If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."  "In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.'  [Citation.]  ' "*[F]light requires neither the physical act of running nor the reaching of a far-away haven.*  [Citation.]  *Flight manifestly does require, however, a purpose to avoid being observed or arrested.*" '  [Citations.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055, italics added.)

In *Bradford*, the defendant did not flee the apartment building where the murder occurred, but he packed his belongings, asked an out-of-town friend if he could come stay with them, and repeatedly asked another friend to drive him out of town, saying he had to " 'get the hell out of here.' " (*People v. Bradford*, *supra*, 14 Cal.4th at p. 1055.) Similarly, here, defendant did not leave the home where the attempted murders had taken place, but he tried to flee.  Darrell testified that while he was holding onto defendant and preventing him from running, defendant repeatedly said he needed to get out of there. When defendant, escorted by Darrell, went downstairs, opened the front door and discovered the officers outside, he slammed the door, broke loose from Darrell and ran toward the back of the house, where he left his knife in the kitchen.  Such evidence was sufficient to let the jury consider whether it reflected a consciousness of guilt on defendant's part.  The evidence is not insufficient simply because defendant was unable to escape from the home before being detained by the officers.

16

**5.** **The Court Did Not Abuse Its Discretion in Denying Defendant's *Romero* Motion**

Defendant contends the court erred in denying his *Romero* motion, arguing that his one prior qualifying strike was from 1988 when he was just 19 years old, that he had since led a productive life, and he did not have the history of a career criminal.

We review a court's ruling on a *Romero* motion under the deferential abuse of discretion standard. (*People v. Williams* (1998) 17 Cal.4th 148, 162 (*Williams*); accord, *People v. Carmony* (2004) 33 Cal.4th 367, 375-376 (*Carmony*) [holding abuse of discretion standard applies to review of a trial court's decision declining to strike a prior strike].) A trial court is " ' "presumed to have acted to achieve legitimate sentencing objectives" ' " and the decision to impose a particular sentence will not be set aside unless an affirmative showing is made that the sentence is irrational or arbitrary. (*Carmony,* at pp. 376-377.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.)

In exercising its discretion whether to strike a prior strike allegation, the court considers various factors, including the nature and circumstances of the defendant's present felonies and prior convictions, the defendant's background, character, and prospects, and whether the defendant may properly be deemed outside the spirit of the Three Strikes law. (*Williams*, *supra*, 17 Cal.4th at p. 161.) The Three Strikes law creates a sentencing norm and "carefully circumscribes the trial court's power to depart from this norm." (*Carmony*, *supra*, 33 Cal.4th at p. 378.) "[T]he law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Ibid.*)

Defendant's qualifying strike for assault was more than 20 years old. However, defendant continued to possess firearms, despite the prohibition against it arising from his felony conviction. He was convicted for possession of a firearm in 1991, and he was convicted of battering a cohabitant in 1998. Defendant was on probation at the time of the instant charges from a 2010 misdemeanor conviction for carrying a loaded firearm in

17

a public place. Although defendant held jobs during this time period and otherwise engaged in productive activity, given the seriousness of the present charges and defendant's consistent involvement in the criminal justice system over his lifetime, we find the court did not abuse its discretion in finding that defendant fell well within the letter and spirit of the Three Strikes law.

## DISPOSITION

The judgment of conviction is affirmed.


GRIMES, J.

WE CONCUR:

BIGELOW, P. J.



FLIER, J.